J-S15031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: Z.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: I.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 16 WDA 2021 |

Appeal from the Order Entered December 7, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000080-2020

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: JULY 9, 2021**

Appellant, I.B. ("Father"), files this appeal from the order dated and entered December 7, 2020, in the Allegheny County Court of Common Pleas, granting the petition of the Allegheny County Office of Children, Youth and Families ("CYF" or the "Agency") and involuntarily terminating his parental rights to his minor, dependent daughter, Z.B., born in February 2019 ("Child" or "the Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  After review, we affirm.

The trial court summarized the procedural and factual history as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's mother, I.D.W. a/k/a A.W. ("Mother"), signed a consent to voluntarily terminate her parental rights to Child and, pursuant to order dated and entered December 7, 2020, the court granted a Petition to Confirm Consent to Adoption and Terminate Parental Rights as to Mother.  Order - Confirm Consent to Termination of Parental Rights, 12/7/20.

The [c]hild in this case was born [in February 2019]. At the time of the termination proceeding, the Child was twenty-two months old. CYF had already been involved with the Child's [m]other since 2014. Mother was a dependent child and had other older children, who had been removed and rights terminated, prior to this [c]hild's birth. Prior to the Child's birth, Mother had tested positive for marijuana at a prenatal appointment and was uncooperative with the [A]gency. Father had been known to CYF as Mother's paramour during her pregnancy; however, CYF became active with Father at the Child's birth. Immediately after being notified of the Child's birth, CYF obtained an Emergency Custody Authorization on February 13, 2019. The Child was placed into foster care upon her discharge from the hospital the following day, and has remained in that same foster home since.

Father told the CYF caseworker and hospital staff that he was not prepared, willing, or able to care for a child. CYF was also aware that Father's housing was unstable and that he had unaddressed substance abuse issues, despite being previously referred to services.

CYF filed a Petition for Dependency on February 26, 2019[] and filed an Amended Petition for Dependency on April 4, 2019. The Child was adjudicated dependent on April 10, 2019. At the time of the adjudication, this [c]ourt found that Father was living between houses, had tested positive for THC [("tetrahydrocannabinol")][2] and was continuing to test positive for THC, and "per his own admission he is not in a position to care for the baby today but wants to work towards reunification."

CYF referred Father for an [sic] POWER [("PA Organization for Women in Early Recovery")] assessment, provided a referral to the DADS program,[3] a referral for coached visitation, a referral to the Urban League of Pittsburgh for housing assistance, and transportation assistance. Father's goals were to address

---

[2] The primary psychoactive component of cannabis or marijuana.

[3] Ms. Ketter explained this program as follows: "It is now what we call Father Engagement[. I]t assists father[s] with understanding the court process, the involvement with CYF, and navigating different systems within CYF and community resources to assist a biological father or parent in trying to regain custody of their child or understanding the termination of parental rights and what that all entails." N.T., 12/7/20, at 19-20.

substance abuse issues, participate in random urine screens, attend coached parenting and visitation, obtain appropriate housing and employment, address his outstanding criminal issues, and attend an anger management class due to allegations of intimate partner violence where the Child's [m]other was the victim.

At the first Permanency Review Hearing after the adjudication, this [c]ourt found that Father had made minimal compliance with the Family Plan and Father made minimal progress towards alleviating the circumstances which necessitated the original placement. This [c]ourt found that Father was struggling to meet his goals, that he was discharged from coached visitation for nonattendance, that he had only two visits, was still in-between houses, tested positive for THC, and had yet to enroll in an anger management class, which was also a condition for a pending criminal case.

At the Permanency Review Hearing on November 23, 2019, this [c]ourt again found minimal compliance and minimal progress, noting that Father was struggling to meet his goals and he had not seen the Child in almost six months.

At the Permanency Review Hearing on January 29, 2020, this [c]ourt again found minimal compliance and minimal progress with Father. The [c]ourt indicated in the findings: "Father has had the same goals. He was [sic] attend BIP [("Batterers Intervention Program")] or anger management - he reported today that he has an intake scheduled then reported he has attended five session[s]. He has not completed a POWER assessment. He has attended 2 out of 29 visits. He is employed and staying with friends. There were some concerns during his visits about diapering, feeding and holding the baby."

At the May 27, 2020 Permanency Review Hearing, this [c]ourt again found that there was minimal compliance and minimal progress by Father. The [c]ourt noted that Father did not participate at the hearing, despite having notice by mail and phone. Father had yet to complete his POWER assessment and had a bench warrant out for failing to comply with his criminal court obligations.

Father had not made any progress to address any of his goals and CYF filed the Petition for Involuntary Termination of Parental Rights on June 16, 2020. At the Permanency Review Hearing on September 9, 2020, this [c]ourt continued to find that

Father had made minimal compliance and minimal progress towards remedying the conditions that led to the Child's removal. More specifically, this [c]ourt indicated that:

> Unfortunately[,] [F]ather has not made any progress toward his goals. He reported today that he is in an anger management class. He has not completed D&A or mental health. Additionally, he has been offered coached visitation multiple times but has been discharged and unable to visit consistently. He has not visited consistently throughout the history of this case. He has continued to not attend with any consistency and when he has attended, he needs prompting about feeding and diaper changes. He was contacted by TRAC [("Three Rivers Adoption Council")] on June 17th to schedule in person visits which were set up[,] but he has not attended consistently. He has unresolved criminal charges. He is living with his father.[4]

The Child has remained in the same foster home where she was placed immediately after birth and upon discharge from the hospital. This [c]ourt has routinely made findings at various proceedings that the Child is doing well in this home and her needs are being met.

Trial Court Opinion, 2/3/21, at 2-6 (footnotes omitted) (citations to record omitted).

Thereafter, the Agency filed a petition for the termination of parental rights on June 6, 2020. The court conducted a hearing on December 7, 2020. Father participated via telephone and was represented by counsel. Child was

---

[4] It is believed that the court intended to state that Father is living with his mother, as Father testified that he is living with his mother. N.T., 12/7/20, at 55.

represented by legal counsel.[5]  The parties presented joint stipulations.  ***See***

Joint Exhibit 1; N.T., 12/7/20, at 6.  The Agency then presented the testimony

of David Reagan[6] and Lisa Ketter, Agency caseworkers.  The Agency further

presented Exhibits CYF 1 and CYF 2, which were admitted without objection.[7]

N.T., 12/7/20, at 51-52.  Lastly, Father testified on his own behalf.

By order dated and entered December 7, 2020, memorializing its ruling

on the record at the conclusion of the hearing, the trial court involuntarily

terminated the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(2),

(5), (8), and (b).[8]  On January 4, 2021, Father, through counsel, filed a timely

notice of appeal, as well as a concise statement of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  Thereafter, on February

3, 2021, the court issued an Opinion.

---

[5] Subsequent to an order appointing legal counsel on September 9, 2020, James J. Robertson, Jr., Esquire, entered his appearance on behalf of Child on October 5, 2020.  Entry of Appearance, 10/5/20.

[6] Mr. Reagan testified solely as to Mother's consent for the voluntary termination of her parental rights.  ***See*** N.T., 12/7/20, at 7-9.  As indicated, the court confirmed Mother's consent to terminate her parental rights.  Order - Confirm Consent to Termination of Parental Rights, 12/7/20; N.T., 12/7/20, at 9.  Mother was not present or represented by counsel at this proceeding.

[7] Exhibit CYF 1 encompasses the certified court orders from the dependency matter, and Exhibit CYF 2 is the Psychological Evaluation Report of Patricia Pepe, Ph.D., licensed psychologist, who, pursuant to referral, was to conduct an individual and interactional evaluations.

[8] While the court likewise indicated changing Child's permanent placement goal to adoption, N.T., 12/7/20, at 86, the issue of goal change is not raised as part of the instant appeal and we therefore address the termination of Father's parental rights only.

On appeal, Father raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. [§ ]2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. [§ ]2511(b)?

Father's Brief at 5 (suggested answers omitted).[9]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all

---

[9] While we observe that Father states his issues slightly different than in his Rule 1925(b) Statement, we find that he has preserved his challenges to the court's order.

credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,*, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). We have long held

that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In the case at bar, in finding grounds for termination of Father's parental rights, including Section 2511(a)(2), the trial court reasoned:

The record clearly demonstrates that CYF met its burden, by clear and convincing evidence, for the grounds alleged pursuant to 23 [Pa.C.S.] §§ 2511(a)(2), (5) and (8). The CYF caseworker testified credibly and competently that the Family Plans and Court Orders addressed the allegations of incapacity of Father as well as the conditions that led to the Child's removal and placement. The caseworker also testified that she "had a conversation with [Father] and I believe he understands what the goals of the case are, and what he need[s] to do to alleviate the circumstances that resulted in court activity in this case."

Father had a goal to establish and maintain independent housing. With respect to the housing goal, this [c]ourt made findings at multiple Permanency Review Hearings that Father was in between housing and/or had not established independent stable housing. The caseworker testified that the first time that Father contacted her to advise he had obtained stable independent housing was on November 17, 2020, well after the Petition to Terminate Parental Rights was filed and only a month before the Contested Involuntary Termination of Parental Rights was scheduled. At the termination proceeding, Father testified that he had housing but that the leasing application was incomplete. Father testified that he could not finish the housing application process until he had the information that was stolen from his wallet, which was a social security card and birth certificate, as well as information for his children so he can "put them down as who's supposed to be staying with me." Father admitted that at the time of the termination proceeding he was living with his mother.

Father had a goal to participate in anger management programming, which was also a requirement for Father's pending criminal matter where Father was to participate in a program to help address intimate partner violence. At the time of the termination proceeding, the caseworker testified that Father had not provided any documentation that he had completed any such programming. Father, however, testified that he had "completed a majority of the classes but because there was a recount it shows that I missed some of the classes but when I talked to the judge he asked me did I mind redoing them and I told him I had no problem as long as it helped me get out of the program. So instead of me having to do the full 24, I only have to do about a good 12-15 classes." Father agreed that he was still in the process of completing that goal at the time of the termination proceeding.

Father had a goal to address his mental health; this goal was established based on Father's self-reporting of a history of depression mental health. The caseworker testified that CYF did not have any documentation to show that Father had participated in any mental health treatment. Father, at the termination proceeding, denied that he had any mental health history and/or that he had ever been recommended for treatment in the past.

- 10 -

Father had a goal to address his substance abuse. Father disclosed to CYF that he used marijuana and Father tested positive for THC several times. CYF referred Father for a POWER assessment and the court directed Father to complete random drug screening. The caseworker testified that CYF did not have any documentation to show that Father had addressed or completed this goal. Father acknowledged that he never had a substance abuse assessment and only attended a few screens. Father contended, at the time of the termination proceeding, that he hadn't used in some time.

Father had a goal of participating in coached visitation. The caseworker testified that this program would have allowed service providers to observe the interaction between Father and Child and provide suggestions to improve his parenting skills. Unfortunately, the caseworker testified that Father was discharged for noncompliance and nonattendance of the coached visitation program.

Father had a goal of visitation. The caseworker testified that there were gaps and inconsistencies with Father's visitation with his [c]hild throughout the twenty-two months Child was in care. When confronted about his lack of regular and consistent visitation, Father explained to the caseworker "that his phone was broken, his wallet was stolen, he was hit on the head with a brick and he was stabbed and assaulted and he was hospitalized and he was not able to engage or talk with the [A]gency." Father admitted he was inconsistent and that he needed to do more. Father also testified that he had lost his wallet two to three months earlier and this interfered with his ability to visit.

Finally, Father had a goal for employment, only insomuch as it would help him obtain independent housing, and a goal to resolve his criminal matters. The caseworker testified that she was unaware if Father had obtained any employment or if he had resolved his criminal matters. Father testified that he was still working on completing some of the classes, and that "[a]s far as I know the case is still active but once I complete all the classes all charges and everything will be dropped."

This [c]ourt found Father's testimony and excuses to be not credible. Other than offering his testimony to counter that of the CYF caseworker, Father did not provide any evidence or witnesses to demonstrate that he had remedied the conditions that led to removal. Even if this [c]ourt was to accept Father's testimony

that he was nearing completion of the anger management goal and that he never needed any mental health treatment, this [c]ourt cannot disregard the evidence that Father did not have stable housing, did not complete any substance abuse evaluation or treatment, did [not] demonstrate sobriety for any extended period of time with negative screens, was discharged from a coached parenting class for nonattendance, and failed to avail himself of regular and consistent visitation with his young [c]hild.

Trial Court Opinion, 2/3/21, at 9-13 (citations to record omitted) (some brackets in original).

Father, however, argues, in part, that there was not sufficient evidence that he cannot remedy, or had not remedied, the conditions that led to Child's removal. Father's Brief at 14-15. Father asserts a lack of evidence establishing that marijuana use impaired his ability to parent Child; that he required coached parenting; that he exposed Child to domestic violence; and that a mental health professional recommended he engage in mental health treatment. *Id.* at 15-16. Further, Father notes he indicated a desire for reunification from February 2019. *Id.* at 16. Lastly, Father suggests that consistent visitation is not a condition causing and/or leading to Child's removal that can be remedied. *Id.* at 16-17. Father concludes:

The record does not contain sufficient evidence to support a determination that Father had not remedied the conditions which led to the removal of [Child] from his care. The majority of testimony presented from CYF was derived from records and not first-hand observations. And much of that testimony was unclear, uncertain, or incomplete. What the record does show is that Father was never provided with an opportunity to show that he could care for [Child]. Father was never even givin [sic] the opportunity to schedule appointments for [Child].

*Id.* at 17 (citation to record omitted).

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that Father failed to complete his goals aimed at reunification. Agency caseworker, Lisa Ketter, recounted that Father's goals included housing, anger management, mental health, sobriety, parenting, employment, and resolution of criminal matters. N.T., 12/7/20, at 16-17. Ms. Ketter further made clear that Father was aware of these goals and/or objectives. She stated, "I, myself, had a conversation with him and I believe he understands what the goals of the case are, and what he need[s] to do to alleviate the circumstances that resulted in the court activity in this case." *Id.* at 16. Moreover, Father admitted he understood what was expected of him related to reunification. *Id.* at 53-54. Notably, the permanency review order of July 24, 2019 and subsequent orders nonetheless revealed minimal compliance and progress. *Id.* at 24-25; *see also* Joint Exhibit 1, at ¶9; *see also* Permanency Review Order, 9/9/20 (stating, in part, "Unfortunately[, F]ather has not made any progress toward his goals."). Ms. Ketter confirmed that this is consistent with the Agency's assessment of Father's actions. *Id.* at 25. She noted Father's lack of contact and failure to complete his goals. Ms. Ketter testified, "Well he's had no contact with the [A]gency. He was noncompliant with all of his goals and with the previous caseworker. My understanding is that just recently he has made himself available[,] but he still has to provide documentation that he is addressing his goals and that the [A]gency does not have that information that he is." *Id.* at 31.

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding

evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal

citations omitted).

> Moreover,
>
> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d at 1219 (quoting ***In re N.A.M.***, 33 A.3d

95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In further finding termination of Father's parental rights was in Child's

best interests pursuant to Section 2511(b), the trial court stated:

> In the instant case, this [c]ourt considered the evidence and testimony presented and found that CYF demonstrated, clearly and convincingly, that termination would meet the needs and welfare of this [c]hild.  The parties were scheduled for [c]ourt[-] ordered evaluations and interactional assessments between the Child and her [f]oster [p]arents, and the Child and her [f]ather. Dr. Patricia Pepe, a court-appointed evaluator, scheduled individual and interactional evaluations in this case with Father, the Child and her [f]oster [p]arents for November 2020.  Father did not attend the evaluation.  Father acknowledged that he received some kind of text providing notice of the evaluation date and time but that he subsequently received another text rescheduling it.  Father admitted that he did not attend on the rescheduled date because no one had called him or told him where it was going to be.  Father's excuse for this was that he did not have his phone or his wallet, which had all of the Child's information, and he did not have transportation.  Dr. Pepe's evaluations concluded that the Child had a healthy bond with her [f]oster [p]arents and the Child was doing very well in their home.

- 15 -

This [c]ourt is also aware that it need not rely on an expert opinion to evaluate or assess the child's emotional bond with the parent as part of the 42 [Pa.C.S.] § 2511(b) analysis. The CYF caseworker testified that it was the [A]gency's opinion that "the bond has been impaired by the lack of compliance with the [A]gency and the lack of contact with the child." The caseworker testified that she has observed interactions between the Child and her foster family and described the Child as very happy and bonded to the people in the home. The caseworker further testified that the foster parents are meeting all of the Child's psychological, developmental and medical needs.

In contrast, the caseworker testified about Father's involvement with his [c]hild and said that Father's visitation was inconsistent, that Father was generally unreachable, that Father did not make any independent efforts to obtain information about the Child's health and welfare, and the caseworker was unaware of Father sending any cards, letters or financial supports to his [c]hild while she was in care.

Father testified about how he viewed his bond with the Child. Father admitted some challenges[] but thought that he was making improvements. However, Father also admitted that he attended eight to ten visits recently and acknowledged there was a span of time where he attended only two out of twenty-nine possible visits.

This [c]hild was placed into this foster home directly from the hospital because her parents were not ready, willing or able to provide care for her. From that point forward, despite services, multiple referrals, and transportation assistance, Father failed to consistently visit and develop a relationship with his newborn [c]hild. In fact, Father had extended stretches of time where he did not have contact with the [A]gency or visit with the Child at all. It is no surprise, therefore, that twenty-two months later this [c]hild has bonded and attached to her foster parents, where she has lived since birth and who have consistently met all her emotional, developmental, and physical needs

This [c]ourt does not doubt that Father cares about his [c]hild; however, this [c]hild's permanency cannot be held in abeyance for Father to gain the requisite maturity to parent and this [c]ourt cannot create a necessary and beneficial bond between [] Father and the Child where one does not exist. Therefore, this [c]ourt was well within its discretion and within the

established caselaw when it determined that severing the Child's bond with her [f]ather [would not] cause extreme emotional consequences for the Child, and that any negative consequences that would result from such termination would be mitigated by any subsequent bond the Child established with the current foster parent.

Trial Court Opinion, 2/3/21, at 13-16 (citations to record omitted).

Father, however, asserts a lack of evidence that termination of his parental rights serves Child's best interests. Father's Brief at 17, 19. Critically, Father points to the fact that there was not an interactional evaluation performed by Dr. Pepe. While acknowledging that this expert opinion is not mandatory, Father asserts that other evidence must therefore be presented to establish Child's best interests. *Id.* at 18-19. He notes his observation of the positive relationship between himself and Child and the lack of any other evidence establishing that it is not a beneficial relationship. *Id.* at 19. Father argues:

> The record does not include sufficient evidence to support a determination that termination of Father's parental rights best serves [Child]'s needs and welfare. Father clearly established the benefit and joy that [Child] derives from her relationship with Father. [Child] deserves to have her beneficial relationship with Father preserved. The only way to ensure this benefit to [Child] is to restore Father's parental rights.

*Id.*

Upon review, we again discern no abuse of discretion. The record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

Significantly, Father's visitation with Child was reported as "minimal and inconsistent," thereby affecting his relationship with Child.[10] N.T., 12/7/20, at 24-25, 38. Ms. Ketter testified, "I believe the bond has been impaired by the lack of compliance with the [A]gency and the lack of contact with the child." *Id.* Further, in addressing whether the relationship between Father and Child was a beneficial relationship, Ms. Ketter continued,

> Often we defer to the interactional process and the [d]octors to make a recommendation for that. At this time[,] I don't believe it would be in her benefit just from reading the record and being familiar with the case and the lack of contact[.] I don't believe it would be beneficial for her to be removed from the current foster home and be in his care. He has even indicated that he would like to maybe have his father who resides in Florida be a caregiver during that conversation that we had on November 17th of this year. So he's [-] I don't believe able to and still not in the position to care for his child.

*Id.* at 26-27.

Moreover, and more importantly, Child has been in her foster home since birth, almost two years at the time of trial, where she resides with her older half-brother. *Id.* at 27. In the foster home, Child's needs are met and she is bonded with her family. *Id.* at 27-28. As described by Ms. Ketter, "She's just [a] very happy and pleasant young lady. Bonded with her foster

---

[10] As indicated by the court, Father testified to attending eight to ten visits and acknowledged a period where he attended only two of twenty-nine visits. *Id.* at 63, 71. Father offered multiple explanations for his minimal visitation, including transportation issues, his wallet being lost and/or stolen, a hospitalization, the fact that he was no longer speaking to Mother who kept track of all the dates and what he needed to do, and COVID-19. *Id.* at 72-75.

home parents and the people that are in the home. I believe a strong bond between her and [her brother] as well." *Id.* at 27-28. This was confirmed by Dr. Patricia Pepe, who conducted an interactional evaluation of Child and her foster parents.[11] *See* Exhibit CYF 2. Dr. Pepe observed Child's "primary and positive attachment" to her foster parents. *Id.* at 3 (unpaginated). Dr. Pepe further opined, ". . .[C]onsidering the child has been with [foster parents] for the entirety of her young life and because she exhibits primary attachment toward her foster parents, it is in her best psychological interest to remain with them, hopefully on a permanent basis." *Id.* As such, Ms. Ketter recommended termination of Father's parental rights. N.T., 12/7/20, at 28.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, Child had been in placement for almost two years, her entire life, and is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or

---

[11] As referenced *infra*, pursuant to referral, an individual evaluation of Father and an interactional evaluation of Father and Child was scheduled before Dr. Pepe, but Father failed to appear. While Father acknowledged receipt of a text message rescheduling his appointment, he suggested he was not provided the appropriate location information. He noted reaching out to his visitation supervisor, but not hearing back from her until a day or two later. He further recounted issues with his phone and wallet, and difficulties with transportation. N.T., 12/7/20, at 45, 62, 72; *see also* Exhibit CYF 2.

her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/9/2021